IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                          No. CR 14-4117 RB

PHILLIP TRACY RODGERS, SR.,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** came before the Court on Defendant's (Phillip Tracy Rodgers, Sr.) Motion to Compel Discovery, filed on January 5, 2015. (Doc. 17). The Government opposes this motion. Argument on this motion was heard on February 25, 2015. For the reasons that follow, the Court denies this motion.

**I.      Background**

Rodgers is charged with possession of diethyl ether, a listed chemical as defined by 21 U.S.C. § 802, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture phencyclidine ("PCP"), in violation of 21 U.S.C. § 841(c)(2). That charge stems from the following incident.

At approximately 9:00 a.m. on September 4, 2014, Defendant entered the United States Border Patrol checkpoint located on Interstate 10 west of Las Cruces, New Mexico. Defendant was the sole occupant of the green GMC Yukon. United States Border Patrol Agent Adrian Acuna approached the vehicle and spoke to Defendant. Agent Acuna noticed a strong chemical odor and felt a burning sensation in his eyes and nose.

When Agent Acuna questioned Defendant about his citizenship, Defendant replied that he was a United States citizen. During the exchange, Agent Acuna noticed that Defendant avoided eye contact and paused before answering questions. Agent Acuna inquired about the Yukon's registration and noticed Defendant's hands were shaking. Defendant opened the glove box and dropped several papers on the floor. Agent Acuna observed Defendant had three or four cell phones. Blankets and other items covered objects in the rear of the vehicle. Agent Acuna asked for and received consent to conduct a canine search of the vehicle.

At the secondary inspection area, Agent Acuna inspected the exterior of the vehicle with Canine Max Q. Agent Acuna and Canine Max-Q are trained and certified by the United States Border Patrol Canine Certification Program to detect concealed humans and the odors of cocaine, marijuana, heroin, and methamphetamine. Canine Max Q alerted to the Yukon but did not indicate to a specific part of the vehicle. An alert without an indication is consistent with the existence of odor all over the vehicle. The alert was nonproductive because none of the substances that Canine Max-Q is trained to alert to was found in the vehicle. Nonproductive alerts occur for a variety of reasons. For instance, a canine may alert to residual odor when the odor-causing substance is no longer present. A nonproductive alert may also occur because law enforcement agents are unable to find well-hidden contraband. Agent Acuna testified that he does not keep track of unproductive alerts. However, in the past, almost every time Canine Max had an unproductive alert and Agent Acuna had the opportunity to interview the occupants of the vehicle, they admitted that someone had previously smoked marijuana in the vehicle.

After Agent Acuna returned Canine Max-Q to his kennel, Agent Acuna started to search the interior the Yukon. In the vehicle's rear compartment, Agent Acuna found 13 five-gallon gasoline containers wrapped in black plastic trash bags. The containers were unlabeled. Agent

Acuna opened one container, which was filled with a liquid emitting the strong chemical odor that Agent Acuna noticed when the vehicle approached primary inspection. Agent Acuna again asked Defendant what was in the containers, which were unmarked. Defendant explained that he did not have a receipt for the liquid and that he had given money to an unknown third-party who purchased the cleaning supplies for him and delivered them to him in a parking lot. Agent Acuna field tested the liquid for methamphetamine and the test result was negative.

Drug Enforcement Administration agents arrived at the checkpoint and took samples from each of the 13 containers. Through field testing, they discovered that ten containers held diethyl ether (approximately 42 gallons), two containers held cyclohexanone (approximately 10 gallons), and one container held bromobenzene (approximately 5 gallons). These chemicals are used to manufacture PCP, and diethyl ether is used to manufacture both PCP and methamphetamine. After Defendant made incriminating statements, he was arrested.

Defendant filed a Motion to Suppress arguing *inter alia* that the agents lacked probable cause to search the Yukon. The Court held an evidentiary hearing on February 25, 2105. At the conclusion of the evidentiary hearing, the Court granted counsel's request to submit proposed findings of fact and conclusions of law on the Motion to Suppress.[1] With respect to Defendant's Motion to Compel, defense counsel stated that the motion was moot with the exception of Defendant's request for an order compelling disclosure of training materials for Canine Max-Q. For this reason, the Court will address the Motion to Compel as it pertains to the training materials for Canine Max-Q.

## II.    Standard

It bears underscoring that there "is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). The Constitution "does not

---

[1] The Motion to Suppress will be addressed separately from the Motion to Compel.

grant criminal defendants the right to embark on a 'broad or blind fishing expedition among documents possessed by the Government.' " *United States v. Mayes*, 917 F.2d 457, 461 (10th Cir. 1990) (quoting *Jencks v. United States*, 353 U.S. 657, 667 (1957)). A defendant's mere allegation that the requested information might be material does not entitle him to an unsupervised search of the government's files. *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987).

General discovery in a criminal case is governed by Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure, which requires the government, on request by the defendant, to produce, *inter alia,* any documents, data, or tangible things in the government's possession, custody or control that (1) are material to preparing the defense or (2) the government intends to use in its case-in-chief at trial. "To show materiality, the evidence must bear some abstract logical relationship to the issues in the case such that pretrial disclosure would enable the defendant significantly to alter the quantum of proof in his favor." *United States v. Lujan*, 530 F. Supp. 2d 1224, 1234 (D.N.M. 2008).

## III.    Discussion

Defendant argues that the dog training materials are material because if the dog was unreliable, the agents lacked probable cause to search the Yukon. The Supreme Court recently held that, in a canine alert case the "question - similar to every inquiry into probable cause - is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013). This analysis requires courts to examine the totality of the circumstances surrounding the canine's alert, instead of applying "rigid rules, bright-line tests, and mechanistic inquiries." *Id.* at 1055.

In *Harris*, the Supreme Court considered how a court should decide whether a drug detection canine's alert during a traffic stop provides probable cause to search a vehicle. *Id.* at 1053. Therein, the United States Supreme Court reviewed a Florida Supreme Court ruling that the Fourth Amendment requires the government to offer evidence from a checklist of items, emphasizing the need for evidence of not only the canine's training and certification but also evidence of performance in the field, including false alerts. *Id.* at 1054-55. The Supreme Court rejected this approach as too formulaic for the totality-of-the-circumstances probable cause inquiry, noting that "a finding of a drug-detection dog's reliability cannot depend on the State's satisfaction of multiple, independent evidentiary requirements." *Id.* at 1056.

Notably, the United States Supreme Court criticized the Florida Supreme Court's overreliance on field data in particular, noting that those records "may markedly overstate a dog's real false positives." *Harris*, at 1056-57. "The better measure of a dog's reliability," the Supreme Court concluded, "comes away from the field, in controlled testing environments." *Id.* at 1057. For that reason, the Supreme Court concluded that evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. *Id.* at 1058. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume that the dog's alert provides probable cause to search. *Id.*

Similarly, the Tenth Circuit has held that reliability of a drug detection dog is typically grounded on evidence of certification and not a statistical analysis of a given canine's actual performance records. *United States v. Ludwig*, 641 F.3d 1243, 1251-52 (10th Cir. 2011) (observing that "courts typically rely on the dog's certification as proof of its reliability."); *United States v. Clarkson*, 551 F.3d 1196 (10th Cir. 2009) (explaining that "[w]hile successful completion of a training course and a current certification would be satisfactory, we do not

exclude the possibility that reliability can be established by other evidence."); *United States v. Bertram*, 307 Fed. Appx. 214, 215 (10th Cir. 2009) (reiterating that reliability of a canine team is "normally, though not exclusively, established by presenting evidence regarding the canine's training and certification."); *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) (observing that "with a canine, the reliability should come from the fact that the dog is trained and annually certified to perform a physical skill."). Courts have held that nonproductive alerts do not render a canine unreliable as such alerts may be based on residual odors or well-hidden contraband. *See United States v. Washington*, 2012 WL 6827228 (S.D. Texas 2012); *United States v. Morales*, 489 F. Supp. 2d 1250, 2007 WL 1560332 (D.N.M. 2007).

The Government supplied proof that Agent Acuna and Canine Max-Q were trained and certified by the United States Border Patrol Canine Certification Program to detect concealed humans and the odors of cocaine, marijuana, heroin, and methamphetamine. (Tr. at 21, 43). Agent Acuna and Canine Max-Q were originally certified on March 17, 2010, and have been recertified annually through February 27, 2015. (Pl. Ex. 3). Supervisory United States Border Patrol Agent and Canine Instructor Eugene Montoya testified that the United States Border Patrol Canine Certification Program is one of the largest training programs in the country and trains all the canines that work at the Border Patrol ports of entry. (Tr. at 41-42).

The Tenth Circuit has held that "the judicial task . . . is . . . limited . . . to assessing the reliability of the credentialing organization, not individual dogs." *Ludwig*, 641 F.3d at 1252. "Of course, if a credentialing organization is proved to be a sham, its certification would no longer serve as proof of reliability." *Id*. Current certification is, in itself, sufficient to establish canine reliability here. *See Kennedy*, 131 F.3d at 1378. It is clear that Agent Acuna and Canine Max-Q were properly certified on the date in question, September 4, 2014. Additionally, Supervisory

Agent Montoya testified that Agent Acuna and Canine Max-Q were trained and certified by United States Border Patrol Canine Certification Program, which is one of the largest training programs of its type in the nation. There has been no suggestion that the United States Border Patrol Canine Certification Program is a sham. Additionally, the nonproductive alert does not necessarily mean that Canine Max-Q acted erroneously. Further investigation into the dog's reliability is not warranted here.[2] As such, Defendant's Motion to Compel will be denied.

**IT IS SO ORDERED.**

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

---

[2]   The Court need not, therefore, reach the Government's arguments that the documents are protected by the law enforcement privilege. (Govt. Resp. 6-9 (arguing that the materials should not be disclosed because they: (1) are protected under the law enforcement privilege; and, (2) contain confidential and sensitive law enforcement techniques that would compromise the law enforcement mission.).)