IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                            No. CR 14-4117 RB

PHILLIP TRACY RODGERS, SR.,

    Defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

**THIS MATTER** is before the Court on Defendant's Motion to Suppress Evidence, filed January 5, 2015. (Doc. 16). Defendant is charged with possession of diethyl ether, a listed chemical as defined by 21 U.S.C. § 802, knowing and having reasonable cause to believe that the listed chemical would be used to manufacture phencyclidine ("PCP"), in violation of 21 U.S.C. § 841(c)(2). Defendant moves to suppress (1) any physical evidence and statements obtained as a result of the search of Defendant and his vehicle on September 4, 2014; (2) any physical evidence and statements obtained as a result of Defendant's detention and arrest on September 4, 2014; (3) any statements obtained from Defendant following his arrest and before the administration of Miranda warnings; and (4) any statements obtained from Defendant after the administration of Miranda warnings. The Court held a suppression hearing on February 25, 2015, heard the testimony of witnesses, received documentary evidence, and heard the arguments of counsel. Having carefully considered the submissions and arguments of counsel and the evidence adduced at the suppression hearing, and being otherwise fully advised, the Court **DENIES** Defendant's motion.

**FINDINGS OF FACT**

Federal Rule of Criminal Procedure 12(d) provides that when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. *See* Fed. R. Crim. P 12(d). The Court makes the following factual findings based on the evidence adduced at the evidentiary hearing, including the testimony from United States Border Patrol ("USBP") Agents Adrian Acuna, Eugene Montoya, and Oscar Delgado, and Drug Enforcement Administration ("DEA") Special Agent William Kirkpatrick.

1. Agent Acuna has been an agent and canine handler with USBP for five years. (Doc. 41, Tr. at 7.) Agent Montoya has served as a USBP agent since 1992, as a canine instructor for USBP since 1999, and a USBP supervisory canine instructor since 2005. (Tr. at 43-44.) Agent Delgado has worked for USBP for six years and been assigned to the field intelligence unit since May 2014. (Tr. at 51-52.) Special Agent Kirkpatrick has worked for the DEA for 19 years. (Tr. at 83.)

2. On September 4, 2014, Agent Acuna was working in the primary inspection area of the USBP checkpoint located on Interstate 10 west of Las Cruces, New Mexico. (Tr. at 7.) At approximately 9:00 a.m., Defendant drove a green GMC Yukon SUV into the primary inspection area of the checkpoint. (Tr. at 7-8.) As soon as Defendant arrived, Agent Acuna could smell "a strong odor, really, really strong" coming from the vehicle. (Tr. at 8, 23.) The odor burned his eyes and nose. (Tr. at 8.)

3. Agent Acuna questioned Defendant about his citizenship, where he was coming from, what he was doing, and the registration of the vehicle. (Tr. at 8.) Defendant was the sole occupant of the vehicle and Agent Acuna had no doubt that Defendant was a United States citizen. (Tr. at 8; 23). However, during the exchange, Agent Acuna noticed that Defendant

avoided eye contact and paused before answering questions. (Tr. at 9.) Defendant seemed nervous and his hands were shaking "really bad." (*Id.*) When Agent Acuna asked Defendant for the vehicle's registration, Defendant opened the glove box and dropped the papers on the floor of the SUV. (*Id.*)

4. Agent Acuna asked Defendant where he was coming from. (Tr. at 9.) Defendant said he had been visiting family in San Antonio, but he did not know where in San Antonio he had visited. (*Id.*) Agent Acuna observed Defendant had three or four cell phones, which were located in the glove box, the center console, and on the front passenger side. (Tr. at 10; 32.) In Agent Acuna's experience, possession of multiple cell phones is indicative of illegal behavior. (Tr. at 10-11.)

5. Additionally, Agent Acuna noticed items in the luggage compartment covered with a blanket, which led Agent Acuna to believe that Defendant was hiding something. (Tr. at 10.) Based on the burning sensation in his eyes and nose, Agent Acuna surmised that the source of the strong chemical odor could be hazardous. (Tr. at 11.) Agent Acuna asked for consent to conduct a canine search of the vehicle. (*Id.*) Defendant consented and Agent Acuna referred the vehicle to the secondary inspection area. (*Id.*)

6. At the secondary inspection area, Agent Acuna inspected the exterior of the vehicle with Canine Max Q. (Tr. at 11.) Agent Acuna and Canine Max-Q are trained and certified by the United States Border Patrol Canine Certification Program to detect concealed humans and the odors of cocaine, marijuana, heroin, and methamphetamine and their derivatives. (Tr. at 13; 17; 21; 43.) Agent Acuna and Canine Max-Q were originally certified on March 17, 2010, and have been recertified annually through February 27, 2015. (Pl. Ex. 3). Supervisory United States Border Patrol Agent and Canine Instructor Eugene Montoya testified that the

United States Border Patrol Canine Certification Program is one of the largest training programs in the country and trains all the canines that work at the Border Patrol ports of entry. (Tr. at 41-42).

7. Agent Acuna testified that Canine Max Q had nonproductive alerts one to three times a day. (Tr. at 29.) A nonproductive alert is when a dog alerts but none of the substances that the dog is trained to alert to is found in the vehicle. (Doc. 20.) Nonproductive alerts occur for a variety of reasons. (*Id.*) For instance, a canine may alert to residual odor when the odor-causing substance is no longer present. (*Id.*) A nonproductive alert may also occur because law enforcement agents are unable to find well-hidden contraband. (Doc. 28.) Agent Acuna testified that he does not keep track of unproductive alerts. (Doc. 29.) However, in the past, almost every time Canine Max had an unproductive alert and Agent Acuna had the opportunity to interview the occupants of the vehicle, they admitted that someone had previously smoked marijuana in the vehicle. (Doc. 42.)

8. Canine Max Q alerted to the SUV, but did not indicate to a specific part of the vehicle. (Tr. at 12.) An alert without an indication is consistent with odor all over the vehicle. (*Id.*) Canine Max Q alerted the entire time he approached and walked around the vehicle. (Tr. at 31.)

9. After Canine Max Q alerted on Defendant's vehicle, Agent Acuna returned Canine Max Q to his kennel, informed Defendant that the dog had alerted, and asked Defendant what was under the blanket. (Tr. at 11; 12.) Defendant responded "cleaning supplies." (*Id.*) After this response, Agent Acuna and other Border Patrol agents escorted Defendant inside the checkpoint waiting room. (Tr. 11-12.) Agent Acuna asked Defendant for identification. (Tr. at 12.) Defendant handed over a prison ID card. (*Id.*) Agent Acuna asked other agents to run checks

4

on Defendant. (Tr. at 13). After the agents escorted Defendant inside the checkpoint and Agent Acuna took his identification card, Defendant was not free to leave. (Tr. at 34).

10. Agent Acuna opened the luggage compartment of the SUV and found it full of unmarked, five-gallon, plastic gasoline containers wrapped in garbage bags. (Pl. Exs. 1 and 2; Tr. at 21.) Agent Acuna removed one of the containers and field tested it for methamphetamine. (Tr. at 14-15; 16.) The test was negative for methamphetamine. (Tr. at 15.)

11. While Agent Acuna searched the SUV, Agent Delgado telephoned the Drug Enforcement Administration and explained the situation. (Tr. 15-16). A DEA official warned Agent Delgado that the chemicals could be dangerous and USBP agents should shop searching the SUV and keep everyone away from the vehicle until DEA agents arrived. (*Id.*). USBP agents followed this advice and shut down the checkpoint. (Tr. at 42.)

12. Record checks revealed that Defendant had been arrested in California in June 2014 for an offense related to controlled substances and he had additional criminal history. (Tr. at 16; 56.) Upon being updated with this information, Agent Acuna went inside the checkpoint and asked Defendant to identify the chemicals in the SUV. (*Id.*) Defendant responded that the chemicals were cleaning supplies. (*Id.*) Agent Acuna asked Defendant for a receipt. (Tr. at 16-17.) Defendant responded that he did not have a receipt because he had given money to a third person and the third person had given the chemicals to him. (*Id.*) Defendant could not identify the chemicals in the containers. (*Id.*)

13. Because the containers were unlabeled and the chemicals were unidentified, Agent Delgado was concerned that the chemicals could pose a safety risk to persons at the checkpoint. (Tr. at 59). Based on this concern, Agent Delgado and USBP Agent Miguel Venegas asked Defendant to identify the chemicals in the containers. (*Id.*) Defendant stated that he would

not answer any questions posed by USBP agents and would only speak to DEA agents from Riverside, and he was working with an organization out of California. (*Id.*) Thereafter, Agent Delgado and Agent Venegas ceased questioning Defendant. (Tr at 61; 67-68; 69.)

14. Agent Delgado and Agent Venegas did not believe Defendant was working with law enforcement due to his criminal history and the fact that they had not been notified of Defendant's alleged cooperation with the DEA. (Tr. at 60.) If Defendant were involved in a controlled delivery, the USBP agents at the checkpoint would have received formal notification through their chain of command. (*Id.*) Due to logistical considerations at the checkpoint, USBP agents placed Defendant in a holding cell. (Tr. at 63.)

15. At 11:15 a.m., DEA Special Agents Kirkpatrick and Joe Gelinas arrived at the checkpoint. (Tr. at 85.) Special Agent Kirkpatrick immediately noticed a very strong odor emanating from the vehicle from 30 feet or more away. (Tr. at 87.) After a briefing from USBP agents, at approximately 11:30 a.m., Special Agent Kirkpatrick field tested the chemicals with a specialized device and discovered the chemical in the container outside the SUV was diethyl ether. (Tr. at 87.)

16. Special Agent Kirkpatrick consulted DEA databases and learned that diethyl ether is used as a precursor chemical for methamphetamine and it is highly flammable. (Tr. 87-88.) Based on this information and the quantities of chemicals present in the SUV, Special Agent Kirkpatrick was concerned for his own safety and that of everyone else at the checkpoint. (Tr. 88-92.) Special Agent Kirkpatrick's safety concerns are reflected by the fact that DEA agents donned specialized suits with breathing apparatus to field test the chemicals. (*Id.*; Pl. Exs. 4 and 5.))

17.     At approximately 12:15 p.m., DEA Special Agents Kirkpatrick and Gelinas interviewed Defendant. (Tr. 61; 93.) USBP Agents Delgado and Venegas were present during the interview, which was conducted in a holding cell inside the station at the checkpoint. (Tr. 61; 93-94.) The DEA agents were closest to Defendant, and the USBP agents were standing closer to the door. (Tr. at 81-82; 96.) When the DEA agents first encountered Defendant, he was asleep on a bench inside the holding cell. (Tr. at 61; 101.)

18.     The DEA agents began the interview by waking Defendant, introducing themselves, and obtaining biographical information from Defendant. (Tr. at 94.) Special Agent Gelinas read Defendant his *Miranda* rights and Defendant waived his rights. (*Id*.) The DEA agents asked Defendant about his relationship with DEA. (Tr. at 95.) Defendant stated that he had been stopped in Corona, California while driving a vehicle containing four barrels of ether. (Tr. at 103.) The agents who interviewed Defendant at that time told him that ether is used to manufacture PCP. (Tr. at 102-103.) In the earlier case, Defendant was booked but not charged. (Tr. at 103.)

19.     During the interview for the instant case, the DEA agents asked Defendant to identify the chemicals in the SUV and explain what he had been doing. (Tr. at 95.) Defendant stated he was working for a person named Strand who had hired him to drive the SUV. (Tr. at 96.) He knew he was transporting ether and he believed the ether would be used to manufacture PCP. (Tr. at 95-96.) During the interview, USBP agents did not ask questions and did not reference the earlier questioning. (Tr. at 61; 68; 70; 96-97.) The interview lasted approximately 30 to 45 minutes. (Tr. at 103.)

20.     The DEA lab truck arrived at the checkpoint at approximately 4:00 p.m. and took samples from each of the containers. (Tr. at 98.) According to the Government, ten containers

held diethyl ether (approximately 42 gallons), two containers held cyclohexanone (approximately 10 gallons), and one container held bromobenzene (approximately 5 gallons). (Doc. 26-1). These chemicals are used to manufacture PCP, and diethyl ether is used to manufacture both PCP and methamphetamine. (*Id.*)

## CONCLUSIONS OF LAW

1.    Defendant contends that the agents lacked probable cause to search the SUV and arrest him. The Fourth Amendment protection against unreasonable searches and seizures extends to border patrol checkpoints. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 556 (1976). However, at a border patrol checkpoint, "border patrol agents may stop, briefly detain, and question individuals without any individualized suspicion that the individuals are engaged in criminal activity." *United States v. Massie*, 65 F.3d 843, 847 (10th Cir. 1995).

2.    It bears underscoring that "border patrol agents have virtually unlimited discretion to refer cars to the secondary inspections area," *United States v. Forbes*, 528 F.3d 1273, 1277 (10th Cir. 2008) (quotation omitted), and may make such referrals without any particularized suspicion of criminal activity, *United States v. Ludlow*, 992 F.2d 260, 263-64 (10th Cir. 1993). Border patrol agents are free to conduct exterior canine searches so long as the vehicle and occupant are otherwise lawfully detained at the time of the inspection. *See United States v. Morales-Zamora*, 914 F.2d 200, 203 (10th Cir. 1990); *see also Illinois v. Caballes*, 543 U.S. 405, 409 (2005). Agent Acuna properly questioned Defendant at the primary inspection area and lawfully referred him to the secondary inspection area. Defendant and his vehicle were lawfully stopped at the checkpoint at the time of the canine inspection. Additionally, Defendant consented to the canine inspection.

3. The Supreme Court recently held that, in a canine inspection case the "question - similar to every inquiry into probable cause - is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013). This analysis requires courts to examine the totality of the circumstances surrounding the canine's alert, instead of applying "rigid rules, bright-line tests, and mechanistic inquiries." *Id.* at 1055.

4. In *Harris*, the Supreme Court considered how a court should decide whether a drug detection canine's alert during a traffic stop provides probable cause to search a vehicle. *Id.* at 1053. Therein, the United States Supreme Court reviewed a Florida Supreme Court ruling that the Fourth Amendment requires the government to offer evidence from a checklist of items, emphasizing the need for evidence of not only the canine's training and certification but also evidence of performance in the field, including false alerts. *Id.* at 1054-55. The Supreme Court rejected this approach as too formulaic for the totality-of-the-circumstances probable cause inquiry, noting that "a finding of a drug-detection dog's reliability cannot depend on the State's satisfaction of multiple, independent evidentiary requirements." *Id.* at 1056.

5. Notably, the United States Supreme Court criticized the Florida Supreme Court's overreliance on field data in particular, noting that those records "may markedly overstate a dog's real false positives." *Harris*, at 1056-57. "The better measure of a dog's reliability," the Supreme Court concluded, "comes away from the field, in controlled testing environments." *Id.* at 1057. For that reason, the Supreme Court concluded that evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his

alert. *Id.* at 1058. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume that the dog's alert provides probable cause to search. *Id*.

6.  Similarly, the Tenth Circuit has held that reliability of a drug detection dog is typically grounded on evidence of certification and not a statistical analysis of a given canine's actual performance records. *United States v. Ludwig*, 641 F.3d 1243, 1251-52 (10th Cir. 2011) (observing that "courts typically rely on the dog's certification as proof of its reliability"); *United States v. Clarkson*, 551 F.3d 1196, 1204 (10th Cir. 2009) (explaining that "[w]hile successful completion of a training course and a current certification would be satisfactory, we do not exclude the possibility that reliability can be established by other evidence"); *United States v. Bertram*, 307 Fed. Appx. 214, 215 (10th Cir. 2009) (reiterating that reliability of a canine team is "normally, though not exclusively, established by presenting evidence regarding the canine's training and certification"); *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) (observing that "with a canine, the reliability should come from the fact that the dog is trained and annually certified to perform a physical skill"). Agent Acuna and Canine Max-Q were trained and certified by the United States Border Patrol Canine Certification Program to detect concealed humans and the odors of cocaine, marijuana, heroin, and methamphetamine. (Tr. at 21, 43). Agent Acuna and Canine Max-Q were originally certified on March 17, 2010, and have been recertified annually through February 27, 2015.

7.  The Tenth Circuit has held that "the judicial task . . . is . . . limited . . . to assessing the reliability of the credentialing organization, not individual dogs." *Ludwig*, 641 F.3d at 1252. "Of course, if a credentialing organization is proved to be a sham, its certification would no longer serve as proof of reliability." *Id*. Current certification is, in itself, sufficient to establish

canine reliability here. *See Kennedy*, 131 F.3d at 1378. It is clear that Agent Acuna and Canine Max-Q were properly certified on the date in question, September 4, 2014.

8.	Supervisory Agent Montoya testified that Agent Acuna and Canine Max-Q were trained and certified by United States Border Patrol Canine Certification Program, one of the largest training programs of its type in the nation. There has been no suggestion that the United States Border Patrol Canine Certification Program is a sham. Additionally, the nonproductive alert does not necessarily mean that Canine Max-Q acted erroneously. Courts have held that nonproductive alerts do not render a canine unreliable as such alerts may be based on residual odors or well-hidden contraband. *See United States v. Washington*, 2012 WL 6827228 (S.D. Texas, Oct. 16, 2012); *United States v. Morales*, 489 F. Supp. 2d 1250, 2007 WL 1560332 (D.N.M. May 10, 2007). A canine's alert to the presence of contraband during an exterior sniff of a vehicle gives rise to probable cause for agents to search that vehicle's interior. *See Clarkson*, 551 F.3d at 1203; *United States v. Rosborough*, 366 F.3d 1145, 1152 (10th Cir. 2004); *United States v. Ludwig*, 10 F.3d 1523, 1527-28 (10th Cir. 1993). Canine Max Q's alert gave Agent Acuna probable cause to search the SUV and arrest Defendant. *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) (canine alert to vehicle provided probable cause to arrest occupants and search vehicle).

9.	Defendant's argument that Agent Acuna lacked probable cause because the chemicals were non-contraband is not persuasive. Ether is recognized as a "List II" chemical that is used in the manufacturing of controlled substances. *See* 21 U.S.C. §§ 802(35)(d) and 841(c). The Supreme Court has recognized that a dog alert on a vehicle establishes probable cause that either drugs or evidence of a drug crime, such as "precursor chemicals" will be found. *Harris*, 133 S. Ct. 1056 n.2. Indeed, a police officer has probable cause to conduct a search when the

facts available to him would "warrant a person of reasonable caution in the belief" that contraband or evidence of a crime is present. *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion). The Tenth Circuit has affirmed a finding of probable cause based on the officers' detection of "a strong chemical odor . . . only associated with the manufacturing of methamphetamine." *United States v. Windrix*, 405 F.3d 1146, 1152 (10th Cir. 2005).

10. In this case, Agent Acuna immediately noticed a strong chemical odor emanating from the SUV that made his eyes and nose burn. Defendant's nervousness, inconsistent answers, multiple cellphones contributed to the calculus. Agent Acuna noticed something hidden in the luggage compartment. Agent Acuna asked for and received consent to conduct a canine search of the vehicle. Canine Max Q alerted to the vehicle, which indicated controlled substances were or had been present. *See United States v. Layman*, No. 06-7124, 244 Fed.Appx. 206, 211 (10th Cir. Jul 26, 2007) (holding that an "overwhelming chemical odor, coupled with" other suspicious circumstances gives rise to probable cause of criminal activity). In addition to the dog alert, these factors gave Agent Acuna probable cause to search the SUV and arrest Defendant.

11. Additionally, exigent circumstances justified the search of the vehicle. *See United States v. Rhiger*, 315 F.3d 1283, 1289 (10th Cir. 2003) (holding that dangers associated with suspected meth lab established reasonable basis to justify officers' warrantless entry); *United States v. Najar*, 451 F.3d 710, 714 (10th Cir. 2006) (holding that officers reasonably believed there existed an immediate need justifying their entry into defendant's residence for purpose of providing emergency aid). The Tenth Circuit has determined the basic aspects of the "exigent circumstances" exception are that (1) the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3)

there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched. *Rhiger*, 315 F.3d at 1288. Nevertheless, "there is no absolute test for the presence of exigent circumstances, because such a determination ultimately depends upon the unique facts of each controversy." *Id.* The Tenth Circuit has held that the assessment of whether the burden is satisfied is "guided by the realities of the situation presented by the record." *Id.* Courts should "evaluate the circumstances as they would have appeared to prudent, cautious and trained officers." *Id*.

12.     Agent Acuna found the luggage compartment was filled with five-gallon gasoline containers wrapped in black plastic trash bags and covered with a blanket. Agent Delgado was on the phone with DEA agents during the search. Agent Acuna opened a container and confirmed that the containers were the source of the chemical odor. Agent Delgado explained the situation to DEA agents, who warned him to stop the search and stay away from the vehicle as the chemicals could pose a serious danger.

13.     Based on the strong chemical odor, and the warning from the DEA agents, Agent Acuna and other agents were justified in reasonably believing that the chemicals posed an immediate threat to themselves and others. The manner of the search was reasonable as it was focused on the source of the chemical odor.  The search revealed that the luggage compartment was filled with five-gallon containers of volatile chemicals. Agent Acuna stopped the search on the advice of the DEA agents. Considering the realities of the situation, the agents had reasonable grounds to believe that there was an immediate need to protect their lives and the lives of others, the search was not motivated by an intent to arrest or seize evidence, and there was a reasonable basis to associate an emergency with the volatile chemicals in the vehicle. Thus, the search of the vehicle was justified by probable cause and exigent circumstances.

14. When Agent Acuna asked Defendant for identification, Defendant presented a prison identification card. Record checks revealed that Defendant had been arrested in June 2014 for a controlled substance offense. Defendant displayed signs of nervousness and gave inconsistent answers about his visit to San Antonio. Canine Max Q alerted to the SUV, which established that the vehicle contained controlled substances or the residue of controlled substances. Based on these facts, Agent Acuna had reasonable suspicion to detain Defendant until he determined what was being transported in the vehicle. *United States v. De La Cruz*, 703 F.3d 1193, 1196 (10th Cir. 2013); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006). Additionally, the presence of unidentified dangerous chemicals combined with the canine alert, Defendant's suspicious behavior, inconsistent responses, possession of multiple cellphones, and criminal history gave rise to probable cause to believe that Defendant was transporting a controlled substance or a derivative of a controlled substance in the SUV or was involved in criminal activity. Additionally, once the DEA agents arrived and determined Defendant was transporting diethyl ether, a precursor of methamphetamine and PCP, the agents had probable cause to believed Defendant was involved in the manufacture of methamphetamine or PCP.

15. Defendant moves to suppress his statements to USBP agents because the statements were obtained without *Miranda* warnings. *Miranda* warnings need only be given to a suspect at the moment that the suspect is "in custody" and the questioning meets the legal definition of 'interrogation." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). By its terms, *Miranda* applies whenever "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). It bears underscoring that a routine stop at a fixed border checkpoint, is not custodial for *Miranda*

purposes. *United States v. Hudson*, 210 F.3d 1184, 1191 (10th Cir. 2000). Therefore, Defendant's responses to Agent Acuna's questions up until the point he handed over his prison identification card and was escorted into the checkpoint waiting room are not covered by *Miranda*.

16. Defendant contends that his subsequent statements in the checkpoint waiting room were obtained in violation of *Miranda*, because they were the result of an interrogation conducted while he was in custody and before he was advised of his constitutional rights. Defendant's contention is foreclosed by the Supreme Court's recognition of the public safety exception to the *Miranda* rule. *See New York v. Quarles*, 467 U.S. 649, 656 (1984).

17 In *Quarles*, the police encountered a rape suspect in a supermarket. 467 U.S. at 654-55. At the time he was detained and frisked, defendant was wearing an empty shoulder holster. *Id.* Before giving defendant his *Miranda* warnings, an officer asked him where the gun was. *Id.* Defendant nodded toward some empty cartons and responded, "the gun is over there." *Id.* After recovering a gun from one of the cartons, the officer formally arrested defendant and read him his rights. *Id.* In holding the gun was properly admitted into evidence, the Court stated: "Whatever the motivation of individual officers in such a situation, we do not believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Id.* at 656.

18. The Court concluded that "the need for answers in a situation posing a threat to public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment right against self-incrimination." *Id.* at 657. In fashioning an exception designed "to guide police officers, who have only limited time and expertise to reflect on and balance the social and

individual interests involved in the specific circumstances they confront," the Court emphasized the distinction between questions necessary to secure the safety of police officers and the safety of the public and questions designed to elicit testimonial evidence. *Id.* at 658. In this case, the USBP agents had an objectively reasonable basis to make a public safety inquiry to identify the chemicals in the SUV. Therefore, Defendants statements to USBP agents in the checkpoint waiting room are not rendered inadmissible by *Miranda*.

19. Defendant contends his statements to the DEA agents after *Miranda* warnings were given are inadmissible as they were tainted by his earlier unwarned statements. As discussed above, Defendant's statements to Agent Acuna in the primary and secondary inspection areas were non-custodial and his statements inside the waiting room were subject to the public safety exception to *Miranda*. Therefore, the subsequent statements to DEA agents could not be tainted. In any event, even if there had been any problem with the earlier statements, Defendant has failed to show the requisite connection to the subsequent statements.

20. In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court held unconstitutional the investigative tactic of eliciting inadmissible confessions from suspects prior to advising them of their rights, and then asking them to repeat the confession a second time after *Miranda* warnings had been extended. The Court reasoned that this two-stage interrogation tactic undermined the purpose of *Miranda* warnings by coercing individuals to give confessions against their will. *Seibert*, 542 U.S. at 613. To enforce its ruling, the Court held that post-*Miranda* warnings obtained using this approach could be held inadmissible under the exclusionary rule. *Id.* at 617.

21. The *Seibert* Court made clear that the mere fact that a suspect was questioned while in custody, but before he was given *Miranda* warnings, does not make any subsequent

16

confession inadmissible. *Id.* at 615. On this point, there was disagreement among the majority as to what post-*Miranda* confessions would be excludable. Justices Souter, Stevens, Ginsburg, and Breyer adopted a series of factors to consider when determining whether "*Miranda* warnings delivered midstream" would be effective. These factors are: (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 615. Furthermore, they held that "a good-faith *Miranda* mistake" that bore "none of the earmarks of coercion" would not cause a post-*Miranda* confession to be excluded from evidence at trial under this rule. *Id.* at 614-15 (citing *Oregon v. Elstad*, 470 U.S. 298 (1985)).

22.     Justice Kennedy, in a concurring opinion, argued that the objective inquiry into the effectiveness of a *Miranda* warning advocated by the plurality was too broad. *Id.* at 622 (Kennedy, J., concurring). Instead, he argued, only post-*Miranda* confessions that were obtained through the deliberate two-step strategy rejected by the Court in *Seibert* should be suppressed, unless curative actions had been taken after the initial interrogation. *Id.* Because Justice Kennedy's more narrow concurring opinion was necessary for the judgment, the Tenth Circuit has stated that it is the controlling precedent with respect to the treatment of post-*Miranda* confessions preceded by pre-*Miranda* interrogation and confession. *See United States v. Sanchez-Gallegos*, No. 09-2146, 412 Fed. Appx. 58, 72-73, 2011 WL 9836 (10th Cir. Jan. 4, 2011) (Ebel, J., Concurring) (unpublished). Therefore, *Seibert* directs courts to hold a confession inadmissible only if it was obtained as a result of a deliberate strategy to elicit an inadmissible confession for the purpose of coercing a second confession after the extension of *Miranda*

17

warnings. No such showing was made in this case. On the contrary, the questioning by the USBP agents was motivated by the potential safety risk posed by the chemicals and bore no indicia of coercion. The questioning by the USBP agents was not detailed, the content did not overlap, the timing and settings differed, different agencies were involved, and the questioning by the DEA agents did not treat the subsequent round as continuous with the earlier rounds. Defendant's statements to the DEA agents after the administration of *Miranda* warnings are not inadmissible as tainted by Defendant's earlier unwarned statements.

23.     The Government had good reason to search the SUV and question Defendant in light of the circumstances. Defendant's arguments to the contrary are unpersuasive.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence, (Doc. 16), filed January 5, 2015, is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**